JUDGE CAPRONI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

LAURIE SPINA, M.D.,

                    Plaintiff,

          - against -

DOWNTOWN BRONX MEDICAL
ASSOCIATES, P.C., and PHYSICIAN AFFILIATE
GROUP OF NEW YORK, P.C.,

                    Defendant.
-------------------------------------------------------------x



14  CV  1366

Civil Action No.

COMPLAINT

JURY TRIAL DEMANDED

## NATURE OF ACTION

1.    Plaintiff Dr. Laurie Spina ("plaintiff" or "Dr. Spina") brings this action against Downtown Bronx Medical Associates, P.C. ("DBMA") and Physician Affiliate Groups of New York, P.C. ("PAGNY") to remedy claims of discriminatorily unequal pay, pursuant to the Equal Pay Act, 29 U.S.C. §§ 206, *et seq.*; and the New York State Equal Pay Act, N.Y. Labor Law § 194, as well as claims of discrimination under the New York State Human Rights Law ("NYSHRL"), Executive Law §§ 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

2.    Plaintiff also brings this action to remedy claims of unlawful retaliation under the Equal Pay Act, 29 U.S.C. § 215(a)(3); the New York Labor Law, N.Y. Labor Law §215; the NYSHRL, Executive Law §§ 290 *et seq.*; and the NYCHRL, N.Y.C. Admin. Code §§ 8-101 *et seq.*

## JURISDICTION and VENUE

3.    This Court has original jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1343 and the Equal Pay Act of 1963, 29 U.S.C. §§ 206(d) *et seq*. This Court has supplemental jurisdiction over plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367.

4.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

5.    Venue is proper in the Southern District of New York pursuant to 29 U.S.C. § 1391(b), as Defendant resides in and has its principal place of business in this district and a substantial portion of events giving rise to plaintiff's claims occurred in the district.

## PARTIES

6.    Plaintiff Dr. Laurie Spina is a resident of Middlesex County, New Jersey.

7.    At all times relevant to the allegations herein, Dr. Spina was an anesthesiologist employed by defendant Downtown Bronx Medical Associates PC ("DBMA"), which is duly incorporated in the State of New York with its principal place of business located at 234 East 149th Street, Suite 80-200, Bronx, New York 10451.

8.    In 2011, DBMA was consolidated with other physician affiliate groups into defendant Physician Affiliate Group of New York, PC ("PAGNY"), which is duly incorporated in the State of New York, with its principal place of business at 234 East 149th Street, Bronx, New York 10451.

9.    DBMA continues to be incorporated in the State of New York.

2

10. At all times relevant to this complaint, DBMA, now PAGNY, has contracted to provide anesthesiologists to work at Lincoln Hospital Medical and Trauma Center ("Lincoln Hospital"), located at 234 E 149th St, Bronx, NY 10451.

## FACTS

### BACKGROUND

11. Dr. Spina graduated from Albany Medical College in 1987.

12. Dr. Spina completed her residency training in anesthesiology at Thomas Jefferson University Hospital in August of 1991.

13. Dr. Spina is certified by the American Board of Anesthesiology and the American Board of Medical Examiners.

14. Dr. Spina has been working as an anesthesiologist since 1991.

15. Dr. Spina was hired by DBMA as an anesthesiologist to work at Lincoln Hospital in November of 2005.

16. All the anesthesiologists in the Anesthesiology Department at Lincoln Hospital were, like Dr. Spina, employed by DBMA, and after its merger in July 2011 with PAGNY.

17. On November 6, 2011, PAGNY replaced DBMA as the contractor for anesthesiology services at Lincoln Hospital.

18. On November 6, 2011, all anesthesiologists previously employed by DBMA to work at Lincoln Hospital automatically became employees of PAGNY.

19. Upon information and belief, after the DBMA and PAGNY merger, PAGNY and DBMA operate as a single entity, with offices in the same location: 234 East 149th Street, Bronx, New York 10451.

3

## UNEQUAL PAY

20.     Throughout her employment with DBMA, DBMA paid Dr. Spina $100 per hour worked.

21.     Starting in 2008, Dr. Spina was paid less than other similarly situated males, with equivalent or less experience, employed by DBMA.

22.     From 2008 until, at least, 2011, other female anesthesiologists employed by DBMA were also paid less than similarly situated men, including:

> a.  Dr. Harriet Jones, who worked at DBMA as an anesthesiologist from before Dr. Spina's hire until 2009;
>
> b.  Dr. Sharon Murillo, who worked at DBMA as an anesthesiologist from 2008 to 2009;
>
> c.  Dr. Michelle Cummerford, who worked at DBMA as an anesthesiologist from 2007 to 2008;
>
> d.  Dr. Linda Critchlow, who is currently employed at DBMA, and was employed there during Dr. Spina's tenure;
>
> e.  Dr. Naheed Ahmadi, who is currently employed at DBMA, and was employed during Dr. Spina's tenure;
>
> f.  Dr. Gloria Rice, who is currently employed at DBMA, and was employed during Dr. Spina's tenure; and
>
> g.  Dr. Lee, who is currently employed at DBMA, and was employed there during Dr. Spina's tenure.

23.     Upon information and belief, the doctors mentioned in ¶ 22 were paid $100 per hour for their work.

4

24.     Until January of 2011, Dr. Spina's schedule earned her an annual salary of $230,000 per year.

25.     Dr. Dimitris Giannarris, a male anestesiologist hired by DBMA to work at Lincoln Hospital in July of 2009 immediately after finishing his residency training in June of 2009, was paid $280,000 per year by DBMA and PAGNY.

26.     Dr. Gorelick, a male anesthesiologist who was also hired by DBMA to work at Lincoln Hospital immediately after finishing his residency training in March of 2011, was paid $280,000 per year by DBMA and PAGNY.

27.     Dr. George Trister, a male anesthesiologist hired by DBMA to work at Lincoln Hospital in 2008, who has a level of experience similar to Dr. Spina, was paid in excess of $300,000 per year by DBMA.

28.     Dr. Kolo Ediale, a male anesthesiologist hired by DBMA to work at Lincoln Hospital in 2010 who has a level of experience similar to Dr. Spina, was also paid in excess of $300,000 per year by DBMA.

29.     Upon information and belief, until January of 2011, Drs. O'Connellll, Giannarris, Ediale, Trister, and Gorelick worked hours at Lincoln Hospital comparable to or less than Dr. Spina.

30.     Drs. Giannarris, Ediale, Trister, and Gorelick held the same position with defendants at Lincoln Hospital as Dr. Spina: anesthesiologist.

31.     Drs. Giannarris, Ediale, Trister and Gorelick, like Dr. Spina, are board certified in anesthesiology.

32.     Drs. Giannarris, Ediale, Trister and Gorelick performed substantially similar work to Dr. Spina while they were employed by defendants at Lincoln Hospital.

5

33.    In 2007, Dr. Alberto Velasco, the Director of the Anesthesiology Department and an agent and employee of defendants, offered Dr. Spina the position of Assistant Director of Anesthesiology, after the previous Assistant Director retired.

34.    Dr. Velasco informed Dr. Spina that the position came with no salary increase or other financial benefit above and beyond what she was paid as an anesthesiologist.

35.    Unwilling to spend more time on administrative tasks without any concomitant financial benefit, Dr. Spina turned the position down.

36.    In August 2008, Dr. James O'Connell, a male anesthesiologist, became the Assistant Director of the Anesthesiology Department — the same position which was offered to Dr. Spina.

37.    However, Dr. O'Connell was given monetary compensation for that position, above and beyond his pay as an anesthesiologist, despite the fact that Dr. Velasco had explicitly told Dr. Spina that, had she accepted the position herself, no additional compensation would be available.

38.    Upon information and belief, Dr. O'Connell, as the Assistant Director of the Anesthesiology Department, and with the same level of experience as Dr. Spina, was making over $400,000 per year in 2011.

39.    Had Dr. Spina accepted the exact same position, she would have made only $230,000 per year, even assuming Dr. Velasco had not reduced her weekend hours without cause (see ¶ 40, infra).

## UNEQUAL ASSIGNMENT OF HOURS

40.    Until January 2011, Dr. Spina regularly worked a 48-hour weekend shift at Lincoln Hospital.

41.    In January of 2011, Dr. Spina's immediate supervisor, Dr. Velasco, reduced Dr. Spina's weekend hours from 48 to 24 hours, claiming that a hospital policy prohibited employees from working more than 24 consecutive hours.

42.    As a result of the reduced hours, Dr. Spina's annual earnings decreased from $230,000 per year to $210,000 per year.

43.    Shortly thereafter, Dr. Spina discovered that two male doctors, Drs. Trister and Giannarris, were given full 48-hour weekend shifts, indicating that the hospital in fact had no policy against 48-hour shifts, but rather that Dr. Velasco had simply given Dr. Spina's hours to her male colleagues.

## UNEQUAL WORK LOAD

44.    Anesthesiologists employed by defendants at Lincoln Hospital were assigned to work shifts regardless of how many patients were in need of anesthesiology and/or related care at any given time.

45.    Thus, there often were more anesthesiologists scheduled to work at Lincoln Hospital during a given shift than there were actual patients needing the care of an anesthesiologist.

46.    Female anesthesiologists were always required to be attending to patients if there were any patients in need of the care of an anesthesiologist.

47.    In contrast, male anesthesiologists were only asked to attend to a patient if all of the female anesthesiologists were already busy attending to other patients.

48.    Thus, Dr. Spina and other female anesthesiologists were attending to patients at all times during their scheduled shifts and were virtually never allowed a break, even to eat lunch.

7

49.     Male anesthesiologist, however, were often found in the break room playing video games or surfing the internet when there were more anesthesiologists on shift than patients needing their care.

## UNEQUAL PAY FOR HOURS NOT WORKED

50.     Anesthesiologists employed by defendants at Lincoln Hospital were required to fill out time sheets.

51.     Dr. Spina was rarely permitted to leave earlier than the end of her scheduled work day, but if she did, she would not be paid for the scheduled hours she did not work.

52.     By contrast, male doctors, including Drs. Trister, O'Connell, Giannarris, Gorelick, and Ediale, were paid for a full day of work regardless of when they arrived or left.

53.     Male doctors, including Drs. Trister, O'Connell, Giannarris, Gorelick, and Ediale, were permitted to fill out their time sheets in a *pro forma* manner, stating that they left and arrived as scheduled, regardless of when they actually left or arrived.

54.     Dr. Spina and other female doctors were routinely required to cover Dr. Trister's code beeper — meaning that they would be on call to respond to any emergencies transmitted to the beeper — because Dr. Trister had already left for the day, often hours earlier than scheduled.

55.     Dr. Spina and other female doctors were asked to do this even when they were already working with patients, and thus could not be reasonably expected to be on call to respond to emergencies.

56.     Upon information and belief, Dr. Trister was paid for a full day of work on the days that he left early and Dr. Spina and other female doctors were required to cover his code beeper, and Dr. Velasco would allow Dr. Trister to fill out his timesheets to indicate that he worked until four o'clock pm, even when he left as early as noon.

8

## UNEQUAL ASSIGNMENTS TO COMMITTEES

57.    Dr. Velasco had the ability to assign anesthesiologists at Lincoln Hospital to hospital committees.

58.    Appointment to a hospital committee confers prestige and authority on doctors, and are helpful for a doctor's career advancement.

59.    Dr. Giannarris, a male anesthesiologist at Lincoln Hospital, was appointed to either the Operating Room Committee or the Quality Improvement Committee, even though he only finished his residency training in June of 2009.

60.    Dr. Trister, a male anesthesiologist at Lincoln Hospital, was appointed to either the Operating Room Committee or the Quality Improvement Committee.

61.    Dr. Spina, who had finished her residency in 1991, and had the same level of experience as Dr. Trister, was not appointed to any hospital committees.

62.    Upon information and belief, no female anesthesiologists employed by DBMA or PAGNY were, or have been, appointed to any hospital committees.

## OTHER DISCRIMINATORY TREATMENT

63.    Drs. Velasco and Trister routinely referred to the female anesthesiologists as "bitches."

64.    For example, when Dr. Giannarris was hired, Dr. Spina heard Dr. Velasco tell Dr. Giannarris that if he had any questions, he should direct them to Dr. Velasco and "ignore the bitches," referring to the female anesthesiologists at Lincoln Hospital.

9

65.    When Drs. Gorelick and Ediale were hired in 2009, Dr. Spina heard Dr. Velasco, again, tell them to "ignore the bitches" -- a statement made not only in the presence of Dr. Spina, but also other medical staff, including surgeons and nurses.

66.    Dr. Velasco referred to the female anesthesiologists as "bitches" in Dr. Spina's presence at least two other times in 2010 and 2011.

67.    In August of 2010, Dr. Trister, a DBMA emoployee, told Dr. Spina in the lunch room that "we don't need you bitches, we're hiring some new men."

68.    This statement was made approximately one month before Dr. Ediale, a male anesthesiologist, was hired by DBMA to work at Lincoln Hospital, and two months before Dr. Caruso, another male anesthesiologist, was hired by DBMA to work at Lincoln Hospital, right out of his residency, in November of 2010.

69.    Residents in training at Lincoln Hospital also informed Dr. Spina that Dr. Velasco had told them to only take rotations with the male anesthesiologist there, telling the residents that only the male anesthesiologists were good enough to learn from.

70.    The male anesthesiologists at Lincoln Hospital refused to refer to the female anesthesiologists there as "Doctor," even in the presence of patients and medical staff, insisting on referring to them as "Ma'am."

71.    The male anesthesiologists at Lincoln Hospital, in turn, insisted on being called "doctor."

72.    When anesthesiologists employed by defendants at Lincoln Hospital were on call, there would be a team of three doctors, led by a "team leader."

10

73.    If there was a male anesthesiologist on the team, no matter how recently he may have graduated from medical school or finished his residency, he would be appointed the "team leader" over women.

74.    For example, in teams of which Dr. Spina was a member, Dr. Gorelick, hired directly out of his residency program in 2011, was assigned to be team leader over Dr. Spina, despite the fact that Dr. Spina was two decades more experienced than Dr. Gorelick.

75.    Defendants' male anesthesiologists, particularly Dr. Velasco, frequently pressured female anesthesiologists to quit.

76.    For example, in January of 2011, when Dr. Spina refused to cover Dr. Trister's code beeper because she was already tending to a patient, Dr. Velasco commented, in front of patients, "I want your resignation."

77.    Thereafter, Dr. Velasco routinely responded to Dr. Spina by simply telling her, "I want your resignation."

## RETALIATION AND DISPARATE TREATMENT OF COMPLAINTS

78.    On March 17, 2011, Dr. Spina complained to her union representative of the DBMA's discriminatory treatment towards female anesthesiologists, including, specifically, paying women less than men for the same work.

79.    On information and belief, the union representative reported Dr. Spina's discrimination complaint to defendants, and, at a minimum, Drs. Velasco and Trister knew of her complaint.

80.    Within days of Dr. Spina's complaint of discrimination, Dr. Trister asked her, in front of colleagues, "when are you fucking leaving?"

11

81.    Upon information and belief, defendants failed to conduct an investigation in response to Dr. Spina's complaint of discrimination.

82.    Dr. Spina was never called into any meeting with DBMA or PAGNY management to discuss her complaints.

83.    Upon information and belief, no one was disciplined for any of the practices Dr. Spina complained of.

84.    Upon information and belief, none of the discriminatory practices Dr. Spina complained of were rectified after her complaint.

85.    Other female doctors had made complaints, some as early as 2006 to DBMA of similarly discriminatory treatment towards women by Dr. Velasco, after which, on information and belief, no investigation was undertaken, no discipline was meted out, and none of the discriminatory policies or practices were changed.

86.    In contrast, when a male anesthesiologist, Dr. Trister, complained that Dr. Spina once referred to him as a "boy", on March 21, 2011, four days after she had complained of discrimination, DBMA conducted a swift investigation.

87.    As part of the investigation of Dr. Spina for referring to someone as a "boy," Peter Gordon, the Executive Director of DBMA, came to the hospital to meet with Dr. Spina and her union representative about the alleged incident.

88.    Prior to entering the room where the meeting was to take place, Dr. Spina asked Mr. Gordon, "when are we going to talk about the way women are treated, and the way we're not being paid equally, and how we do all the work?"

89.    Mr. Gordon ignored her entirely, and refused to even enter the room in which the meeting was to take place.

12

90.    Thereafter, Dr. Spina received a written reprimand for referring to Dr. Trister as a "boy."

91.    Neither Dr. Trister nor Dr. Velasco were disciplined for calling Dr. Spina and other female doctors, on numerous occasions and in public, as "bitches."

92.    Despite male doctors routinely leaving their shift early, and being nonetheless compensated for a full day of work, in March and April of 2011, shortly after she complained of discrimination to her union representative and to DBMA's Executive Director, Dr. Spina was given written discipline for taking three sick days without a doctor's note.

93.    In the six years Dr. Spina had worked at DBMA, she had never previously taken a sick day.

94.    Defendants disciplined Dr. Spina in retaliation for complaining of sex discrimination.

## CONSTRUCTIVE DISCHARGE

95.    Having previously complained, and had her complaints ignored, further complaints by Dr. Spina of unequal and discriminatory treatment were futile.

96.    Having already had her hours cut, and with nowhere to turn to seek remedy, Dr. Spina's working conditions were intolerable and she had no choice but to resign her position in May of 2011.

97.    Upon information and belief, other female anesthesiologists employed by DBMA and/or PAGNY were forced to resign due to discriminatory treatment, including:

a. Dr. Harriet Jones,

b. Dr. Sharon Murillo, and

c. Dr. Michelle Cummerford.

13

## FIRST CAUSE OF ACTION:

## UNEQUAL PAY IN VIOLATION OF THE EQUAL PAY ACT

98.     Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

99.     At all times relevant to this action, plaintiff was employed by defendants within the meaning of the Fair Labor Standards Act ("FLSA") 29 U.S.C. §§ 201 *et seq.*, as amended to include the Equal Pay Act, 29 U.S.C. §§ 206(d) *et seq.*

100.    At all times relevant to this action, defendants were employers within the meaning of the FLSA and the Equal Pay Act.

101.    The acts, practices and policies of DBMA and PAGNY, as set forth above, constitute discrimination against plaintiff, in violation of the FLSA and the Equal Pay Act, by unlawfully paying female employees less than male employees for equal work.

102.    Upon information and belief, defendants were aware of complaints and requests for investigation made by its female anesthesiologists concerning defendant's unfair pay practices, but did not rectify or investigate its unlawful pay practices.

103.    Defendant's violations of the Equal Pay Act were willful and/or reckless, entitling plaintiff to the three year statute of limitations and liquidated damages available under the FLSA and the Equal Pay Act.

## SECOND CAUSE OF ACTION:

## VIOLATION OF THE NEW YORK STATE EQUAL PAY ACT

104.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

14

105.  At all times relevant to this action, plaintiff was employed by defendants within the meaning of Article 6 of the New York Labor Law §§ 190, *et seq.*

106.  Defendants violated the right of plaintiff to be paid the same as male employees performing equal work, in violation of New York Labor Law § 194.

107.  The acts, practices and policies of defendants DBMA and PAGNY, as set forth above, constitute discrimination against plaintiff, in violation of the New York State Equal Pay Act, N.Y. Labor Law § 194, *et seq.*

108.  Upon information and belief, defendants were aware of complaints and requests for investigation made by its female anesthesiologists concerning defendant's unfair pay practices, but did not rectify or investigate its unlawful pay practices.

109.  Defendants violations of the New York Labor Law §§ 190, *et seq.*, were therefore willful within the meaning of N.Y. Labor Law § 198, entitling plaintiff to liquidated damages.

## THIRD CAUSE OF ACTION:

## DISCRIMINATION IN VIOLATION OF THE NYSHRL

110.  Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

111.  Plaintiff was at all times relevant to this complaint, employed by defendants within the meaning of the NYSHRL, New York Executive Law §§ 290, *et xeq.*

112.  Defendants, through its agents and employees, discriminated against Dr. Spina in the terms and conditions of her employment by, *inter alia*, paying her less than similarly situated males, disciplining her more harshly than similarly situated males, assigning work duties unequally between Dr. Spina and similarly situated males, treating Dr. Spina's complaints less

15

seriously than the complaints of similarly situated males, and by allowing its male employees, including Drs. Velasco and Trister, to use offensive gender-based language when referring to female employees including Dr. Spina.

113. The acts, practices and policies of defendants DBMA and PAGNY, as set forth above, constitute discrimination against plaintiff, in violation of the NYSHRL, New York Executive Law §§ 290, *et seq.*

114. The practices and policies of defendants DBMA and PAGNY caused plaintiff to suffer emotional distress and to incur economic damages.

## FOURTH CAUSE OF ACTION:

## DISCRIMINATION IN VIOLATION OF THE NYCHRL

115. Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

116. Plaintiff was at all times relevant to this complaint, employed by defendants within the meaning of the NYCHRL, N.Y.C. Admin Code §§ 8-101 *et seq.*

117. Defendants, through its agents and employees, discriminated against Dr. Spina in the terms and conditions of her employment by, *inter alia,* paying her less than similarly situated males, disciplining her more harshly than similarly situated males, assigning work duties unequally between Dr. Spina and similarly situated males, treating Dr. Spina's claims less seriously than the complaints of similarly situated males, and by allowing its male employees, including Drs. Velasco and Trister, to use offensive gender-based language when referring to female employees including Dr. Spina.

16

118.    The acts, practices and policies of defendants DBMA and PAGNY, as set forth above, constitute discrimination against plaintiff, in violation of the New York City Human Rights Law, N.Y.C. Admin Code §§ 8-101, *et seq.*

119.    The acts, practices and policies of defendants DBMA and PAGNY caused plaintiff to suffer emotional distress and economic damages.

120.    The acts, practices and policies of defendants DBMA and PAGNY were undertaken with malice and/or reckless indifference to plaintiff's rights under City law, entitling her to an award of punitive damages.

### FIFTH CAUSE OF ACTION:

### RETALIATION IN VIOLATION OF THE EQUAL PAY ACT

121.    Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

122.    Defendants unlawfully retaliated against plaintiff by issuing her unwarranted and unduly harsh discipline after she complained of discriminatorily unequal pay to her union representative and to DBMA Executive Director Peter Gordon.

123.    The acts, practices and policies of defendants DBMA and PAGNY, as set forth above, constitute retaliation against plaintiff for engaging in protected activity, in violation of the FLSA and the Equal Pay Act.

17

## SIXTH CAUSE OF ACTION:

## RETALIATION IN VIOLATION OF THE NEW YORK LABOR LAW

124.   Plaintiff repeats and realleges each and every allegation contained in this
Complaint with the same force and effect as if fully set forth herein.

125.   Defendants unlawfully retaliated against plaintiff by issuing her unwarranted and
unduly harsh discipline after she complained of discriminatorily unequal pay to her union
representative and to DBMA Executive Director Peter Gordon.

126.   The practices and policies of defendants DBMA and PAGNY, as set forth above,
constitute retaliation against plaintiff for engaging in protected activity, in violation of the New
York Labor Law, N.Y. Labor Law §215.

127.   The practices and policies of defendants DBMA and PAGNY, as set forth above,
were undertaken wilfully and without good faith effort to comply with the law, entitling plaintiff
to liquidated damages under N.Y. Labor Law § 215.

## SEVENTH CAUSE OF ACTION:

## RETALIATION IN VIOLATION OF THE NYSHRL

128.   Plaintiff repeats and realleges each and every allegation contained in this
Complaint with the same force and effect as if fully set forth herein.

129.   . Defendants unlawfully retaliated against plaintiff by issuing her unwarranted and
unduly harsh discipline after she complained of discriminatorily unequal pay and unequal
treatment of female employees to her union representative and to DBMA Executive Director
Peter Gordon.

18

130.    The practices and policies of defendants DBMA and PAGNY, as set forth above,

constitute retaliation against plaintiff for engaging in protected activity, in violation of the

NYSHRL, Executive Law §§ 290 *et seq.*

131.    The practices and policies of defendants DBMA and PAGNY caused plaintiff to

suffer emotional distress and to incur economic damages.

### EIGHTH CAUSE OF ACTION:

### RETALIATION IN VIOLATION OF THE NYCHRL

132.    Plaintiff repeats and realleges each and every allegation contained in this

Complaint with the same force and effect as if fully set forth herein.

133.    Defendants unlawfully retaliated against plaintiff by issuing her unwarranted and

unduly harsh discipline after she complained of discriminatorily unequal pay and unequal

treatment of female employees to her union representative and to DBMA Executive Director

Peter Gordon.

134.    The practices and policies of defendants DBMA and PAGNY, as set forth above,

constitute retaliation against plaintiff for engaging in protected activity, in violation of the

NYCHRL, N.Y.C. Admin. Code §§ 8-101 *et seq.*

135.    The acts, practices and policies of defendants DBMA and PAGNY caused

plaintiff to suffer emotional distress and economic damages.

136.    The acts, practices and policies of defendants DBMA and PAGNY were

undertaken with malice and/or reckless indifference to plaintiff's rights under City law, entitling

her to an award of punitive damages.

19

# DEMAND FOR RELIEF

WHEREFORE, plaintiff respectfully requests this Court grant the following relief:

(a)  Find that defendants discriminated and retaliated against plaintiff in violation of the FLSA as amended to include the Equal Pay Act, 29 U.S.C. §§ 201 *et seq.*; the New York State Equal Pay Act and New York Labor Law, N.Y. Labor Law §§ 190 *et seq.*; the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq.*; and the New York City Human Rights Law, N.Y.C. Admin Code §§ 8-101 *et seq.*

(b)  Enjoin defendant from violating the Equal Pay Act and the New York State Equal Pay Act by paying women at rates lower than men for substantially similar work.

(c)  Enjoin defendants from violating the NYSHRL and NYCHRL by discriminating against women in the terms and conditions of their work;

(d)  Award plaintiff back pay together with all other benefits to which plaintiff is entitled, with prejudgment interest;

(e)  Award plaintiff compensatory damages, including damages for mental anguish, pain and suffering and humiliation;

(f)  Award plaintiff punitive damages;

(g)  Award plaintiff the cost of this action together with reasonable attorneys fees and costs;

(h)  Award plaintiff liquidated damages in the amount of one quarter of plaintiff's back pay for the six years prior to the filing of this complaint, due to defendants' willful and intentional conduct directed at plaintiff in violation of the New York

20

State Equal Pay Act, N.Y. Labor Law § 194., pursuant to New York Labor Law Article 6 ¶ 198 1-a;

(i)    Award plaintiff liquidated damages in the amount of one hundred percent of plaintiff's back pay for the three years prior to the filing of this complaint, due to defendant's willful and reckless conduct directed at plaintiff in violation of the Equal Pay Act. 29 U.S.C. §§ 206(d) *et seq.*, pursuant to 29 U.S.C. § 216(b);

(j)    Issue a declaratory judgment that the practice complained of herein are unlawful under the Equal Pay Act, 29 U.S.C. §§ 206(d) *et seq.*, and the New York Equal Pay Act, N.Y. Labor Law § 194; and

(k)    Award plaintiff such other relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP 38(b), plaintiff demands a trial by jury.

Dated: New York, New York
         February 19, 2014

                                                          Respectfully submitted,

By:

                                                          Christine Clarke
                                                          John A. Beranbaum
                                                          BERANBAUM MENKEN LLP
                                                          80 Pine Street, 33rd Floor
                                                          New York, New York 10005
                                                          Ph: (212) 509-1616
                                                          Fax: (212) 509-8088

21